# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# HAMMOND DIVISION

| | |
|---|---|
| JOSHUA R. JONES, ET AL., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) CAUSE NO. 2:14-CV-26-PPS |
| v. | ) |
| | ) |
| TOWN OF HIGHLAND INDIANA, | ) |
| ET AL., | ) |
| | ) |
| Defendants. | ) |

## OPINION AND ORDER

This case involves the tragic shooting of a mentally ill man, Joshua Jones, inside his home by a police officer who was called there to respond to a domestic dispute. Jones was 27 at the time and suffered from schizophrenia. He lived in the home with his mother. The police were called to the residence because Jones' odd and frightening behavior made his mother concerned for her safety. Two officers arrived at the residence and a struggle involving Jones, his mother, and the two officers ensued, which ultimately resulted in one of the officers fatally shooting Jones. Jones' mother filed this action on behalf of herself, Jones, and Jones' estate against the officers and several others alleging claims of excessive force, wrongful death, and intentional infliction of emotional distress. Several of the claims and defendants were previously dismissed, and because I find that the shooting, while immensely tragic, was a reasonable use of force, the remaining claims are now disposed of on the defendants' motion for summary judgment.

**Background**

At the time of his death, Joshua Jones was 27 years old, stood 5 foot 7 inches tall, and weighed 177 pounds. [DE 31-5 at 2.] Jones lived with his mother, Marcella Amos, in a second floor apartment in Highland, Indiana. [DE 28-1 at 6; DE 28-8 at 141.] Jones was diagnosed with schizophrenia in 2008 and had a history of being noncompliant with his prescribed medications. [DE 28-8 at 39-41, 112, 214.] Amos testified that people were often misled by Jones' size, and described Jones as having been "extra strong" since he was a child. [DE 31-2 at 3.] Since the age of five, Jones had been taking martial arts lessons on and off. Jones attempted to join the U.S. Marine Corps in the fall of 2008 but was sent home after a week and a half due to mental illness. [DE 28-8 at 59.]

Jones has an unfortunate history of prior commitments to mental health facilities. In January 2009, Amos had Jones committed to a mental ward in Merrillville, Indiana after Jones was not acting himself one night—he broke his cell phone by throwing it down, and it "seemed like he didn't understand English." [*Id.* at 35, 38.] At some point after Jones' first commitment, Amos visited the Highland Police Department to let them know that, although her son was not violent, she might need their help to have him committed a second time. [*Id.* at 36–38.] Amos testified that she "might have talked to the police chief" during this visit. [*Id.* at 36.] During Jones' second commitment—this time at St. Margaret in Dyer, Indiana—Amos testified that it "took three to four policemen" to restrain Jones and "they kind of had to eventually body-slam him." [DE 31-2 at 3.] Amos had Jones committed for a third time, this time to St. Catharine's. [*Id.*

at 22]. On this third occasion, two Highland Police Officers and two paramedics took Jones away. The record is unclear on the date of these last two commitments, except that his commitment to St. Catherine's occurred after his commitment to St. Margaret.

After his commitment in 2009, Jones was prescribed medication for his schizophrenia, which initially consisted of monthly shots, but at the time of his commitment at St. Margaret, he wasn't taking his shots. [DE 28-8 at 37–39.] By January 2012, Jones was supposed to take four pills every day; two milligrams of risperidone twice a day, and two milligrams of benzodiazepine twice a day. [*Id.* at 42.] Jones died on Tuesday, January 31, 2012, just after midnight. The last time he took any of his prescribed medication was Sunday, January 29, 2012, and it was only a half-dose. [*Id.* at 41.] And Jones did not take any of his medication the four days prior to that. [*Id.* at 41–42.]

According to Amos, her son "had been acting different" on Monday, January 30. [*Id.* at 43.] In the afternoon, he "came and kind of put his arm around [Amos'] neck from behind," which Amos said was out of character for Jones despite him saying that he was just playing around. [*Id.* at 43–44.] Amos says that Jones had "weird, strange looks on his face" and was "acting strange, watching [her]." [*Id.* at 44.] Jones also cursed earlier in the day, which Amos says he didn't normally do, when she asked if he was going to take his medication. [*Id.*] But when Amos asked Jones if he needed to talk to someone or go to the doctor, he responded "No, I don't need to talk to anyone." [*Id.* at 60.]

3

Some time later that day, Jones entered Amos' bedroom holding a knife with one hand while bending the blade of the knife with the other. [DE 28-8 at 44, 52–53.] Amos told Jones "about three or four times" to put the knife back, and he did so when he saw that Amos was about to get up from her bed. [*Id.* at 52.] Some time after this incident, while Amos was going to the kitchen to return a plate of food, Jones reached out to touch her neck at a "pulse point," something Jones had learned about in his martial arts classes. [*Id.* at 54.] Amos blocked him. [*Id.*] Jones then told Amos that it looked like she had a lump on her neck, so Amos proceeded to the bathroom to check. [*Id.*] As Amos was on her way, Jones asked her what she was scared of and why she was "running." [*Id.*] Amos responded that she wasn't running and that she wasn't afraid; she was "just looking to see if there [was] a lump on [her] neck." [*Id.*] In fact, Amos *was* afraid because Jones was near a container full of knives. [*Id.* at 46, 123.]

After checking her neck in the bathroom, Amos went back to her bedroom, locked her door, and blockaded the door. [*Id.* at 45, 54.] Amos says she blockaded the door based on instinct since Jones was not acting normal. To put it plainly, she was in "safety mode." [*Id.* at 46.] In fact, Amos was so alarmed by Jones' behavior that while blockaded in her bedroom, she texted her mother instructing her to call the police, which her mother did. [*Id.* at 46-47.]

This is when Officer Orth and Corporal Anderson came into the picture. After the 911 call from Amos' mom, both were dispatched to Amos' home for a domestic disturbance "possibly between a mother and son." [*Id.* at 140.] An ambulance was also

4

dispatched to Amos' home so that Jones could be taken to the hospital for medical attention. [*Id.* at 143.] Before Orth and Anderson rang the buzzer of Amos' house, Jones asked his mother if she called the police. [*Id.* at 47.] She feigned ignorance and asked Jones what the police were there for and told him to let them in. [*Id.*] "[R]ight before the buzzer rang," Amos heard Jones "fumbling like he might have picked up a knife." [*Id.*] Amos "hurried up" and texted her mother again imploring her to call the police immediately and let them know that she thought Jones picked up a knife. [*Id.*]

Jones let the officers in and Amos slowly came out of her room. [*Id.* at 48.] Orth, Anderson, and Amos talked in the living room area of the house. Amos told the officers that her son was schizophrenic and recounted the strange things he had done earlier that day, including that he had threatened her with a knife. [*Id.* at 67, 142; DE 9 at 5–6.] So the officers well knew that they were dealing with someone with a serious mental illness. Amos asked Jones to move out of the kitchen area, away from the knives, and into the living room. [DE 28-8 at 48.]

In the meantime, Amos' mom called 911 as Amos had requested. This call came into dispatch at 12:51 am on January 31. She told the dispatcher, consistent with what Amos had told her, that Jones "might have a knife." [*Id.* at 13–14.]

Meanwhile, back inside the Amos apartment, Amos asked Jones to show the officers the knife he had earlier, but Jones denied having a knife. [DE 28-1 at 19.] While Orth, Amos, and Jones were in the living room area talking, Anderson stepped away to talk to dispatch on his radio. [*Id.*] The dispatcher informed Anderson that Jones might

5

have a knife. [DE 28-8 at 14.] At that moment, Jones suddenly lunged at his mom and hit her in the face, knocking her onto her back in the hallway. [*Id.* at 49–50; DE 28-1 at 19.] Jones jumped on her and started swinging at her. [DE 28-8 at 50.]

The parties offer somewhat differing versions of what happened next. Amos testified that as Jones was on top of her on the floor of the hallway, Orth struggled with Jones and ended up on top of him. [*Id.*; DE 31-2 at 10.] Amos was on her back, Jones was directly on top of her and facing her, and Orth was on Jones' back also facing Amos. [DE 31-2 at 10.] Jones was moving his arms about in a sort of "[g]et off me" motion. [*Id.*] Orth then said "Tase him, tase him," and Anderson, who was standing away from the struggle, responded by saying "I'm coming. I'm coming." [*Id.* at 11.] Anderson came over and positioned himself on top of Orth. [*Id.*] Amos then heard Jones yell and felt a "sparkling" sensation, but didn't see Anderson deploy his taser. Amos then rolled out from underneath Jones and into the kitchen, and then she stood up. [*Id.*]

At this point, Jones was pinned face down underneath Orth, who managed to restrain Jones' dominant right arm and put his knee in Jones' back, while Anderson was standing by. [*Id.* at 11, 12, 20, 22.] Amos couldn't see where Jones' left arm was, but didn't see Jones get hold of Orth's baton or reach for his gun while she was in the apartment. [*Id.* at 14, 20.] Amos says that Jones was "glued to the ground." [*Id.* at 14.] Amos acknowledged that when she retreated to the kitchen, Jones continued to struggle with the officer, prompting Amos to yell to him to stop putting up a struggle. [*Id.*]

6

Amos testified that she then scrambled out of the apartment and shut the door behind her. [*Id.*] She says that it was just a matter of seconds between when she crawled out from underneath the pile up to when she exited the apartment. [*Id.* at 26.] When Amos was right outside the door, she heard Jones saying "Get off me, get off me" and making a noise like "Uh, uh, uh." [*Id.* at 14.] A few seconds later, she heard three gunshots. [*Id.* at 14–15.]

Amos testified that it was "less than ten seconds or so" from when she last saw Jones pinned to the ground to when she heard the three gunshots. [*Id.* at 27.] She didn't hear any sounds of a struggle while outside her apartment door and didn't hear any more shots while exiting the apartment building. [*Id.* at 20, 27.] Amos testified that, in total, it was "[m]ore or less" thirty seconds from when Amos exited her apartment to when she made it outside of the building. [*Id.*] Amos stated in an interview with a Highland Police detective the night of the shooting that she was in fear for her life and that the she believed that the officers acted to save their lives that night. [DE 28-1 at 33.]

Under the officers' version of the events, Jones was facing Orth—not Amos—during the struggle on the floor of the hallway. [DE 31-1 at 28–29.] Orth attempted to restrain Jones and get him in handcuffs. [*Id.* at 7-8.] Jones was resisting Orth's restraint, striking him in the facial area once or twice, and Orth lost his handcuffs during the struggle. [*Id.* at 8–9.] Jones then grabbed for Orth's gun "and tried to get it out of the holster." [*Id.* at 8.] Orth clamped down on his gun with both his hands and

7

yelled out that Jones was trying to get his gun. [*Id.* at 9–10.] Orth recalls hearing Jones say "give me your gun" and being punched in the face a few times. [DE 28-1 at 57.] There was a struggle for Orth's gun, which was holstered on his right side next to his baton. Anderson came over and put his hand on top of Orth's and Jones' hands, then deployed his taser on Jones seconds later. [*Id.* at 10; DE 28-1 at 57.] The taser's log indicates that Anderson first deployed it 12 seconds after 12:58am. [DE 28-8 at 11.] After Anderson deployed his taser, he backed down the hallway and reloaded a second taser cartridge. [DE 28-1 at 47.] According to the officers, Amos left the house some time during this struggle, but they don't know exactly when that was. [*Id,* at 47, 59.]

At some point during the struggle, according to the officers, Jones got hold of Orth's baton, located only inches away from Orth's gun on his right side. [DE 31-1 at 14; DE 28-2 at 144.] Jones grabbed the baton with his non-dominant left hand and struck Orth in the back of his head with it once or twice. [DE 28-8 at 145; DE 31-1 at 14-15.] For her part, Amos testified that while she did not see Jones with the baton in his hand, she had no reason to disbelieve that he had taken it and attacked the officers with it once she left the apartment. [DE 31-2 at 11, 17.]

After hitting Orth with the baton this first time, Jones went toward Anderson. [DE 28-1 at 57.] Orth then heard Anderson's taser go off again in the living room. [*Id.* at 58.] The taser log shows that Anderson deployed his taser 34 seconds after 12:58am, exactly 22 seconds after he first deployed it. [DE 28-8 at 11.] Jones then came back at Orth, hitting him in the hand once or twice with the baton. [DE 28-1 at 58.] After

8

attacking Orth, Jones advanced toward Anderson with the baton in hand. [*Id.* at 50.] Jones swung the baton at Anderson, striking him in his left arm. [*Id.* at 51.] Jones backed up, looked towards the hallway, and then "focused back on [Anderson]" and started to come towards him again. [*Id.* ] While getting up from the floor, Orth saw Jones advancing with the baton raised high toward Anderson, who was backed up against the hallway door. [*Id.* at 58.] Anderson says he considered himself in a life and death struggle, so he drew his firearm. [*Id.* at 51.] Anderson says he fired two or three times, but Jones continued to advance with the baton raised, so he fired another four or five times, after which Jones fell to the ground. [*Id.*] Orth's version varies slightly: he says he heard four shots, then two shots, then saw Jones collapse. [*Id.* at 58.] Anderson then got on his radio and said, "Shots fired." [*Id.*]

Orth estimates that the whole struggle, from when Jones first struck his mother, to when Anderson first shot Jones, lasted approximately a minute. [DE 28-8 at 154.] This estimate seems accurate as it is corroborated by the fact that the total time from when the dispatcher told Anderson that Jones might have a knife, which was when the struggle started, to when Anderson said "shots fired" over the radio, was between 38 and 51 seconds. [*Id.* at 14.]

The defendants provide the affidavit of Dr. William Smock, who determined that both Orth and Anderson's medical history and statements were consistent with the physical evidence and the injuries on their bodies. [*Id.* at 194-95.] According to Dr. Smock, there was evidence that Officer Orth sustained blunt force trauma to his head as

a result of being struck by Jones, which caused a scalp hematoma. [*Id.*] Anderson also sustained blunt force trauma to his arms and hands. [*Id.*] Dr. Smock determined that Jones was shot eight times. [*Id.* at 197.] According to Dr. Smock, the bullet wounds also support the officers' version of events. [*Id.* at 198.] One of the bullets that entered Jones' body ricocheted off of the baton, flattening the bullet, and leaving a corresponding mark on the baton. [*Id.*] A bullet that entered Jones' left hand resulted in a wound path consistent with Jones swinging the baton with his left hand. [*Id.* at 199.] And another bullet, which "entered the back of Jones' neck with a downward trajectory," suggests that Jones was either advancing toward Anderson or "charging at [him] with his head lowered." [*Id.*] The defendants also provide reports from two police practices experts who determined that Anderson's use of deadly force was consistent with law enforcement standards and practice. [*Id.* at 175; DE 28-21 at 11.]

Amos filed this suit on her own behalf, on behalf of her son, and on behalf of her son's estate against the Town of Highland, Dan Vasser (individually and in his official capacity as President of Highland Town Council), the Highland Police Department, Peter Hojnicki (individually and in his official capacity as Chief of Police for the Town of Highland), Corporal Shawn Anderson (individually and in his official capacity as Corporal in the Highland Police Department), and Officer Brian Orth (individually and in his official capacity as an officer in the Highland Police Department).

Some of the claims were previously dismissed either voluntarily or by order of the Court. Here's what remains: (1) a section 1983 claim for excessive force against

Corporal Anderson and Officer Orth in their individual capacities; (2) a section 1983 claim under *Monell* against the Town of Highland; and (3) a state law claim for wrongful death against the Town of Highland. [DE 14 at 15.]

The defendants now seek summary judgment on these remaining claims. [DE 27.] Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## Discussion

I will begin with the defendants' argument that they are entitled to summary judgment on Amos' excessive force claim against Corporal Anderson and Officer Orth. Corporal Anderson claims to have been faced with an imminent threat of death or great bodily harm in his encounter with Jones, thus justifying his use of deadly force. [DE 28 at 11-15.] A police officer's use of deadly force is a seizure within the meaning of the Fourth Amendment and so it must be reasonable. *Tennessee v. Garner*, 471 U.S. 1, 7 (1985). Deadly force may be used if the officer has probable cause to believe that a suspect poses a threat of serious physical harm to the officer. *Muhammed v. City of Chicago*, 316 F.3d 680, 683 (7th Cir. 2002) (citing *Garner*, 471 U.S. at 11-12); *Sherrod v. Berry*, 856 F.2d 802, 805 (7th Cir. 1988) (en banc). The suspect need not necessarily be armed with a firearm to justify the use of deadly force. *See Sherrod*, 856 F.2d at 805 (suspect was unarmed); *City & Cty. of San Francisco, Calif. v. Sheehan*, 135 S. Ct. 1765, 1775, 191 L. Ed. 2d 856 (2015) (suspect was armed with a knife). So when a police

officer "believes that a suspect's actions places him, his partner or those in the immediate vicinity in imminent danger of death or serious bodily injury, the officer can reasonably exercise the use of deadly force." *Sherrod*, 856 F.2d at 805.

The relevant inquiry is objective. *See Graham v. Connor*, 490 U.S. 386, 397 (1989). The officer's subjective good or bad intentions do not enter into the analysis. *See id.* And there's no room for Monday morning quarter-backing. This means that courts must view the matter "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396. Moreover, the reasonableness calculation must be a pragmatic one taking into account "the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Scott v. Edinburg*, 346 F.3d 752, 756 (7th Cir. 2003) (citing *Graham*, 490 U.S. at 396-97).

The central issue for this claim, therefore, is when Anderson fired his weapon, whether it is more likely than not that he reasonably believed that he was in imminent danger of death or serious bodily harm. The evidence relied upon by the defendants indicates that it is. It is undisputed that Jones was schizophrenic, not taking his medication, was "extra strong" for his size and trained in martial arts, and was acting bizarrely in the hours preceding his death—so much so that Amos went into "safety mode" and blockaded herself in her bedroom and texted her mother to call the police. Amos explained these events, including that Jones had schizophrenia, was not acting

like himself, and had threatened her with a knife, to the officers during their meeting in the living room before Jones assaulted his mom.

It also is undisputed that while Amos, Jones, and Orth were in the living room, and Anderson had stepped away to talk to dispatch and learned that Jones may have a knife, Jones suddenly lunged at his mom and hit her in the face, knocking her into the hallway. While the accounts of what happened next differ in some respects, it is undisputed that there was a pile up of Amos, Jones, and Orth on the floor of the hallway and Jones was tased by one of the officers, the effects of which were felt by Amos on the bottom of the pile. At some point, and the record is admittedly unclear on when exactly this happened, Amos freed herself from the pile and scurried out of the apartment. She testified that as she freed herself and walked out, she saw that Jones was pinned to the floor underneath Orth, who had restrained Jones' right arm and put his knee in Jones' back. But according to Amos, Jones was still struggling with the officer when Amos left the apartment; she had asked him to stop struggling before leaving the apartment. [DE 31-2 at 14].

The officers say that at some point after Jones was tased, Anderson backed away to reload his taser and Jones got hold of Orth's baton, striking Orth with it once or twice in the back of the head and then went for Anderson, who again tased Jones, who turned around and went back for Orth, hitting him in the hand once or twice. The officers say that Jones then advanced on Anderson with Orth's baton in hand, swinging it and striking Anderson again. Jones then backed away, looked towards the hallway, and

13

again started advancing towards Anderson with Orth's baton raised high and Anderson was backed up against a door. It was at this point that Anderson considered himself in a life and death struggle, drew his firearm, and fired several shots at Jones until he ceased to advance and fell to the ground.

As I mentioned, the record is unclear on exactly where Amos was during the critical time when Jones wrestled the baton away from Orth. Amos says that she did not see Jones get hold of the baton and she was already outside by the time Jones was shot. But recall that she also conceded that she had no reason to disbelieve the officers' testimony that at some point, Jones got a hold of one of the officers' batons. [DE 31-2 at 11, 17]. With Jones being deceased, there are no other eye-witnesses to the shooting and the events immediately prior to it. All we have to go on are the officers' accounts. And it's important to keep in mind that events moved rapidly that night. The entire struggle, from when Jones first lunged at Amos to when he fell to the ground after being shot, lasted approximately one minute.

The officers' testimony about what happened after Amos left the apartment is corroborated by a forensic expert. The expert testified that the physical evidence showed that Jones had the baton at the time Anderson employed deadly force. Indeed, both Orth and Anderson had evidence of blunt force trauma used against them. And there is evidence that one of the bullets ricocheted off of the baton before entering Jones' body, thus confirming that Jones had the baton at the critical time. What's more, the trajectory of the bullets shows that Jones was advancing on Anderson when the shots

14

were fired. In addition, reports from two police practice experts, submitted by defendants and unrebutted by Jones, confirm that the use of deadly force was consistent with law enforcement standards and practice. "Officer Anderson's deployment of deadly force in this case was proper and justified in accord with and consistent with standards of police practices and procedures and in accord with the universal training and instruction provided to law enforcement officers in the United States with respect to the circumstances which present a need for the use of deadly force in the texts of the record in ths case." [DE 28-8 at 189.]

Amos points to several facts that she believes are material and in dispute to combat the defendants' motion for summary judgment on this issue, but those facts are either not material to the issue or require impermissible speculation on my part to create a potential dispute. For example, while the direction that Orth was facing in the pile up that occurred when Jones attacked Amos [DE 31 at 3-4] may be disputed, this fact is not material to the issue of whether Anderson reasonably believed he was in imminent danger of death or serious bodily harm. Furthermore, the fact that Amos did not see Jones attempt to touch Orth's gun [*id.* at 4-5] and did not see Jones gain control of Orth's baton [*id.* at 4] does not mean that these events did not occur and only asks me to speculate that they may have not. Similarly, Amos also offers the fact that the police never tested Orth's baton for Jones' prints [*id.* at 4], that Jones was right handed [*id.* at 5], and that Jones was pinned to the ground when Amos left the apartment [*id.* at 4] as an invitation for me to impermissibly speculate that maybe Jones did not ever have

15

control of Orth's baton. But that would all be speculation on my part. Amos is inviting this kind of speculation because she *admittedly* did not see what happened in the apartment after she left. So at the end of the day, the officers' testimony regarding what happened inside that apartment after Amos left remains uncontradicted and, based on the evidence, Anderson had probable cause to believe that he was in imminent danger of death or serious bodily injury, and it was, therefore, reasonable for him to use deadly force. Anderson's actions, therefore, did not violate Jones' constitutional rights. Furthermore, because I find that Anderson did not violate Jones' constitutional rights, Orth cannot be subjected to bystander liability, as Amos argues [DE 31 at 17-18]. *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994). For these reasons, summary judgment is granted as to the excessive force claim against Orth and Anderson.[1]

The defendants also move for summary judgment on Amos' 42 U.S.C. § 1983 unconstitutional custom, policy, or practice claim against the Town of Highland, premised on *Monell* liability. Amos claims the Town permitted excessive use of police force to such an extent that it constituted a policy or custom. (Compl. ¶¶ 27-37.) "[T]o prevail on a *Monell* claim, the plaintiff must establish (1) that he suffered a constitutional injury, e.g., he was a victim of excessive force by a police officer, and (2) that the city authorized or maintained a custom of approving the unconstitutional conduct." *Thompson v. Boggs*, 33 F.3d 847, 859 (7th Cir. 1994).

---

[1] Because I find that the officers did not violate Jones' constitutional rights, there is no need for me to delve into the officers' qualified immunity argument. *Scott v. Harris*, 550 U.S. 372, 377 (2007).

Here, Amos fails on the first step because, as discussed above, Jones did not suffer a constitutional injury because Anderson had probable cause to believe that he was in imminent danger of death or serious bodily injury when he shot Jones, and it was, therefore, reasonable for him to use deadly force. "Neither the City nor the police officers' supervisor can be held liable on a failure to train theory or on a municipal policy theory absent a finding that the individual police officers are liable on the underlying substantive claim." *Estate of Phillips v. City of Milwaukee*, 123 F.3d 586, 597 (7th Cir. 1997). As the Supreme Court of the United States held:

> [N]either *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), nor any other of our cases authorizes the award of damages against a municipal corporation based on the actions of one of its officers when in fact the jury has concluded that the officer inflicted no constitutional harm. If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have authorized the use of constitutionally excessive force is quite beside the point.

*Los Angeles v. Heller*, 475 U.S. 796 (1986) (per curiam). Because Jones did not suffer a constitutional injury, Amos' *Monell* claim against the Town of Highland cannot be sustained and the defendants' motion for summary judgment on this claim is granted.

The lone remaining claim is Amos' wrongful death claim, which is grounded in state law. The principle of comity would normally encourage me to relinquish supplemental jurisdiction over a state law claim and to hold that dismissal applies only to the federal side of the case. *See* 28 U.S.C. § 1367(c)(3); *Hansen v. Bd. of Trs. of Hamilton Southeastern Sch. Corp.*, 551 F.3d 599, 608 (7th Cir. 2008). 28 U.S.C. § 1367(c)(3) provides

17

that "[t]he district courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction." But "[w]hile a district court *may* relinquish its supplemental jurisdiction if one of the conditions of § 1367(c) is satisfied, it is not required to do so." *Hansen*, 551 F.3d at 608 (emphasis in original); *see also Williams Elecs. Games, Inc. v. Garrity*, 479 F.3d 904, 907 (7th Cir. 2007) (finding that it is a presumption and not a rule that if federal claims drop out before trial, the district court should relinquish jurisdiction over the state-law claims). Supplemental jurisdiction is a doctrine of discretion and its justification lies in considerations of judicial economy, convenience, comity, and fairness to litigants. *Hansen*, 551 F.3d at 608. Because Amos' wrongful death claim arises from the exact same conduct as her federal claims, the claims are inextricably intertwined and, having already decided the issue in this Opinion, it would make no sense for me to dismiss this claim to be litigated in state court costing both the state judiciary and the parties more time and money. *Hansen*, 551 F.3d at 608. As such, I will rule on this final claim.

Indiana's wrongful death statute provides that "[w]hen the death of one is caused by the wrongful act or omission of another, the personal representative of the former may maintain an action therefor against the latter, if the former might have maintained an action had he or she, as the case may be, lived, against the latter for an injury for the same act or omission." Ind. Code § 34-23-1-1. Indiana law provides that a law enforcement officer is justified in using deadly for if the officer "has probable cause

18

to believe that deadly force is necessary . . . to effect an arrest of a person who the officer has probable cause to believe poses a threat of serious bodily injury to the officer or a third person." Ind. Code § 35-41-3-3. For the reasons explained above, I find that Anderson's use of deadly force was reasonable because he had probable cause to believe the he was in imminent danger of death or serious bodily injury. For these reasons, defendants' motion for summary judgment on Amos' wrongful death claim against the Town of Highland is granted.

## CONCLUSION

For the aforementioned reasons, the Court **GRANTS** Defendants' Motion for Summary Judgment [DE 27]. Because this Opinion and Order disposes of all remaining claims, the Court **DIRECTS** the clerk to **ENTER FINAL JUDGMENT**. The clerk shall treat this civil action as **TERMINATED**. All pending dates and motions in this case are **VACATED**.

**SO ORDERED.**

ENTERED: September 6, 2016

s/ Philip P. Simon
PHILIP P. SIMON, CHIEF JUDGE
UNITED STATES DISTRICT COURT